UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| CALIFORNIA VALLEY MIWOK TRIBE, a federally-recognized Indian tribe, THE GENERAL COUNCIL, SILVIA BURLEY, RASHEL REZNOR; ANJELICA PAULK; and TRISTIAN WALLACE,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>RYAN ZINKE, in his official capacity as U.S. Secretary of Interior; MICHAEL BLACK, in his official capacity as Acting Assistant Secretary of Interior-Indian Affairs; WELDON LOUDERMILK, in his official capacity as Director of the Bureau of Indian Affairs,<br><br>　　　　Defendants. | CIV. NO. 2:16-01345 WBS CKD<br><br><u>MEMORANDUM AND ORDER RE: CROSS-</u><br><u>MOTIONS FOR SUMMARY JUDGMENT</u> |

----oo0oo----

Plaintiffs Silvia Burley, Rashel Reznor, Anjelica Paulk, and Tristian Wallace ("Burley faction") brought this action against defendants Secretary of Interior Ryan Zinke,

1

Acting Assistant Secretary of Interior Michael Black, and Director of the Bureau of Indian Affairs ("BIA") Weldon Loudermilk[1] ("federal defendants") for violation of the Administrative Procedures Act ("APA"), declaratory relief, injunctive relief, and due process violations arising out of a BIA decision on the tribal membership and recognized government of the California Valley Miwok Tribe ("Tribe"). Several alleged Tribe members, including Yakima Dixie, intervened ("intervenor defendants"). (Docket No. 30.) Plaintiffs, federal defendants, and intervenor defendants now move for summary judgment. (Docket Nos. 44, 46-47.)

I. Factual and Procedural Background

This action is part of a long-running leadership dispute over the Tribe between the Burley faction and Yakima Dixie that has resulted in actions in state courts, federal courts, and administrative agencies. See Cal. Valley Miwok Tribe v. United States, 424 F. Supp. 2d 197 (D.D.C. 2006) ["Miwok I"]; Cal. Valley Miwok Tribe v. United States, 515 F.3d 1262 (D.C. Cir. 2008) ["Miwok II"]; Cal. Valley Miwok Tribe v. Jewell, 5 F. Supp. 3d 86 (D.D.C. 2013) ["Miwok III"]. The Tribe is a federally recognized tribe, formerly known as the "Sheep Ranch Rancheria of Me-Wuk Indians of California." (2015 AR 1397.)[2]

---

[1] Federal defendants are automatically substituted for their predecessors pursuant to Federal Rule of Civil Procedure 25(d).

[2] Because the administrative decision challenged here is a reconsideration of a prior 2011 administrative decision following remand in Miwok III, there are two administrative records. The court will refer to the 2011 Decision's administrative record with the citation (2011 AR XX) and the 2015

In 1915, John Terrell of the Office of Indian Affairs conducted a census of "Sheepranch Indians" in Calaveras County, California. (2011 AR 3-5.) At the time of the census, there were thirteen Sheepranch Indians. (2011 AR 3.) In 1916, the United States acquired a 0.92 acre parcel of land, known as "Sheep Ranch Rancheria," for these Indians. (2011 AR 3-6.)

In 1934, Congress passed the Indian Reorganization Act ("IRA"), which required the BIA to hold elections where a tribe would decide whether to accept provisions of the IRA, including provisions permitting tribes to organize and adopt a constitution. 25 U.S.C. §§ 5123, 5125. The BIA found that there was only one eligible adult Miwok Indian, Jeff Davis, living on the rancheria in 1935.[3] (2011 AR 13, 20.) He voted in favor of adopting the IRA but the Tribe never pursued formal organization. (2011 AR 13, 20.)

Amended in 1964, the California Rancheria Act authorized the termination of federal recognition of California Rancherias by distributing each rancheria's assets to the Indians residing on the rancheria. (2011 AR 1687; 2015 AR 1399.) At that time, Mabel Dixie was the sole Miwok resident on the land. (2011 AR 38.) She voted to accept the land distribution plan and terminate the trust relationship between the federal government and the Tribe. (2011 AR 47-51.) The BIA failed, however, to take the necessary steps to complete the termination of the

---

Decision's administrative record with the citation (2015 AR XX).

[3] The Department of the Interior's 1935 census found that the Sheep Ranch Rancheria had an approximate population of sixteen members, but only Davis lived on the property. (See 2011 AR 2062.)

3

rancheria. (2011 AR 83-84.)

Mabel Dixie died in 1971 and an Administrative Law Judge ordered the distribution of her estate. (2011 AR 61.) Her common law husband and four sons, including Yakima Dixie, received an undivided interest in the land. (Id.) By 1994, Yakima Dixie represented that he was the only living descendant of Mabel and recognized Tribe member. (2011 AR 82.)

### A. Leadership Dispute

In 1998, the Burley faction received Dixie's permission to enroll in the Tribe. (2011 AR 110-14.) In September 1998, the BIA met with Dixie and Burley in order to discuss formal organization of the Tribe. (2011 AR 172-76.) The BIA noted that it believed that the original tribal membership was limited to the heirs of Mabel Dixie because of the land distribution during probate. (2011 AR 173.) The Tribe's membership then expanded with the addition of the Burley faction. (2011 AR 173.)

In November 1998, the BIA drafted, and Dixie and Burley signed, Resolution #GC-98-01 ("1998 Resolution"). (2011 AR 177-79.) The 1998 Resolution listed Dixie and the four member Burley faction as Tribe members. (2011 AR 177.) It also established "a General Council to serve as the governing body of the Tribe." (2011 AR 178.) In 1999, Burley submitted Dixie's resignation as tribal chairman to the BIA, but Dixie claimed he did not resign. (2011 AR 180, 1573.) The BIA affirmed the General Council's authority as the governing body of the Tribe in February 2000 and continued to recognize the General Council and Burley's leadership through 2005. (2011 AR 249-54, 2691.)

In February 2004, Burley submitted a tribal

constitution to the BIA "in an attempt to demonstrated that it is an 'organized' Tribe" under the IRA. (2011 AR 1095.) The BIA rejected the constitution because it did not reflect the involvement of "the greater tribal community." (2011 AR 1095-96.) The BIA restated this position in February 2005 when it concluded that it did not recognize any tribal government or tribal chairperson for the Tribe. (2011 AR 610-11.)

        B.    Miwok I and Miwok II

The Burley faction challenged the denial of their proposed constitution. Miwok I, 424 F. Supp. 2d at 201. The court reasoned that while the Tribe has flexibility in organizing under the IRA, the BIA has an obligation to ensure that governing documents "have been 'ratified by a majority vote of adult members.'" Id. at 202. Because the Tribe "failed to take necessary steps to protect the interests of its potential members," the court dismissed the complaint. Id. at 202-03.

The D.C. Circuit affirmed the district court. Miwok II, 515 F.3d at 1268. The court reasoned that "tribal organization under the [IRA] must reflect majoritarian values," the Burley faction admits the Tribe has a potential membership of 250, and the proposed constitution did not involve the majority of those members. Id. at 1267-68.

        C.    2010 Decision and Miwok III

While Miwok II was pending, the BIA met with the parties in order to promote organization under the IRA. (2011 AR 1261.) In November 2006, the BIA published notice of a General Council meeting in order to initiate the reorganization process. (Id.) The Burley faction appealed this decision. The Regional

5

Director affirmed the November 2006 notice, reasoning that the purpose of the meeting was to identify the putative group who has a right to participate in the Tribe's organization. (2011 AR 1494-98.)

Burley appealed this decision to the Interior Board of Indian Appeals ("IBIA"), who affirmed, in part, the Regional Director. (2011 AR 1502, 1684-705.) The IBIA also noted that the April 2007 decision involved an "enrollment dispute." (2011 AR 1703.) Because the IBIA lacks jurisdiction over enrollment disputes, it referred this issue to the Assistant Secretary for Indian Affairs. (Id.)

In August 2011, the Assistant Secretary issued a decision ("2011 Decision") that was "a 180-degree change of course" from the BIA's previous position on the Tribe. (2011 AR 2049-50.) The Assistant Secretary concluded: (1) the Tribe is a federally recognized tribe; (2) the Tribe's citizenship consists solely of Dixie and the Burley faction; (3) the Tribe operates under a General Council government under the 1998 Resolution; (4) the "General Council is vested with the governmental authority of the Tribe"; (5) the Tribe is not organized under the IRA and is not required to organize under it; and (6) the United States cannot treat tribes not organized under the IRA differently than tribes organized under the IRA. (2011 AR 2049-50.) Dixie challenged this decision in federal district court.

The district court in Miwok III focused on the Tribe's citizenship and the recognition of the General Council as the Tribe's government. Miwok III, 5 F. Supp. 3d at 96. The court held that the 2011 Decision was arbitrary and capricious because

the Assistant Secretary assumed, without explanation, that the Tribe was comprised of only five members and the General Council was the recognized tribal government. Id. at 97-100. The record was replete with contrary evidence, but the Assistant Secretary "ma[de] no effort to address any of this evidence in the record." Id. at 98. The court vacated the 2011 Decision and remanded the case to the Assistant Secretary to reconsider the number of tribal members and validity of the General Council. Id. at 100-01.

D. December 2015 Decision

The Assistant Secretary issued his December 2015 Decision in response to the Miwok III remand. He held, based on the record and previous federal court decisions, "that the Tribe's membership is more than five people, and that the 1998 General Council does not consist of valid representatives of the Tribe." (2015 AR 1402.) He further concluded that the General Council was a tribal body that could manage the process of reorganizing the Tribe, but the majority of eligible Tribe members did not approve the General Council. (2015 AR 1401.)

Plaintiffs challenged the December 2015 Decision and brought this suit against federal defendants under the APA. The court granted intervenor defendants' Motion to intervene on August 25, 2016. (Docket No. 29.) The court previously denied plaintiffs' Motion to stay enforcement of the December 2015 Decision. (Oct. 24, 2016 Order 8:1-4 (Docket No. 37).)

II. Legal Standard

The APA governs judicial review of administrative agency actions. In reviewing the administrative decision, the

district court "is not required to resolve any facts" that may exist in the underlying administrative record. Occidental Eng'g Co. v. I.N.S., 753 F.2d 766, 769 (9th Cir. 1985).  Rather, the court must "determine whether or not, as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did." Nehemiah Corp. v. Jackson, 546 F. Supp. 2d 830, 838 (E.D. Cal. 2008) (Karlton, J.); see also Occidental Eng'g, 753 F.2d at 769-70.

Under the APA, the reviewing court must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  An agency acts in an arbitrary and capricious manner when it "offer[s] an explanation for its decision that runs counter to the evidence before the agency[] or is so implausible that it c[an]not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983). "The arbitrary and capricious standard of review is 'highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency.'" Aguayo v. Jewell, 827 F.3d 1213, 1226 (9th Cir. 2016) (quoting San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 601 (9th Cir. 2014)).

"Even when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may be reasonably discerned.'" Ala. Dep't of Envtl. Conservation v. E.P.A., 540 U.S. 461, 497 (2004) (quoting Bowman Transp. Inc. v. Ark.-Best

Freight Sys., Inc., 419 U.S. 281, 286 (1974)). A court will "sustain an agency action if the agency has articulated a rational connection between the facts found and the conclusions made." Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation, 426 F.3d 1082, 1090 (9th Cir. 2005).

III. Supplementing the Administrative Record and Judicial Notice

Plaintiffs request that the court take judicial notice of over forty documents, many of which are not part of the administrative record. (See Docket Nos. 44-3, 45, 48-1.) Plaintiffs filed these requests almost one month after the deadline to file a motion to supplement the administrative record. (See Status Order 2:28-3:1 (Docket No. 41).)

Generally, the reviewing court is limited to the administrative record. Great Basin Mine Watch v. Hankins, 456 F.3d 955, 975 (9th Cir. 2006). When asking for judicial notice of documents in a case where the court is reviewing an agency action, the requesting party must meet one of four exceptions:

> (1) admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision; (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

Lands Council v. Powell, 395 F.3d 1019, 1030 (9th Cir. 2005); see Rybachek v. E.P.A., 904 F.2d 1276, 1296 n.25 (9th Cir. 1990) (construing a motion for judicial notice as a motion to supplement the record).

Plaintiffs do not mention these exceptions, let alone discuss how the supplemented documents qualify under any

9

exception. They only argue that these documents are relevant to their various arguments. Plaintiffs have not "met [their] heavy burden to show that the additional materials . . . are necessary to adequately review" the Assistant Secretary's decision. See Fence Creek Cattle Co. v. U.S. Forest Serv., 602 F.3d 1125, 1131 (9th Cir. 2010). The court denies plaintiffs' request for judicial notice of extra-record materials.

IV. Discussion

The December 2015 Decision reached two conclusions that plaintiffs argue are arbitrary and capricious. First, membership in the Tribe is not limited to five people. (See 2017 AR 1399.) Second, the United States does not recognize a valid government for the Tribe. (See 2017 AR 1401.)

    A.    Whether Tribe is Made up of More than Five People

The December 2015 Decision found that membership in the Tribe is not limited to five people. (2015 AR 1399.) Instead, the Tribe's membership consists of:

> (1) the individuals listed on the 1915 Terrell Census and their descendants; (2) the descendants of Rancheria resident Jeff Davis (who was the only person on the 1935 IRA voters list for the Rancheria); and (3) the heirs of Mabel Dixie (the sole Indian resident of the Rancheria eligible to vote on its termination in 1967).

(2015 AR 1400.)[4] The Assistant Secretary based this conclusion on: (1) the Miwok I and Miwok II decisions that held the Tribe consisted of more than five people; (2) the Miwok III conclusion that "the record is replete with evidence that the Tribe's

---

[4] The December 2015 Decision refers to these categories of members as the "Eligible Groups."

10

membership is potentially significantly larger than just the[] five individuals"; and (3) the meaning of the term "rancheria" and the Department of Interior's treatment of the California Rancherias. (2015 AR 1399-400.) Plaintiffs argue that the administrative record does not support this conclusion.

Federal defendants argue that preclusion prevents plaintiffs from now attempting to re-litigate the issue of Tribe members because this issue was resolved in a prior proceeding. A prior court decision will have preclusive effect under the doctrine of issue preclusion where:

> (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding.

Hydranautics v. FilmTec Corp., 204 F.3d 880, 885 (9th Cir. 2000) (quoting Younan v. Caruso, 51 Cal. App. 4th 401, 406-07 (2d Dist. 1996)). The party asserting issue preclusion bears the burden of showing what the prior judgment determined. Id. "[T]he concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." Allen v. McCurry, 449 U.S. 90, 95 (1980) (quoting Montana v. United States, 440 U.S. 147, 153 (1979)).

First, Miwok I and Miwok II necessarily decided whether three members constituted a majority of the Tribe.[5] Miwok I and

---

[5] The issue here is not identical to the issue in Miwok III. Miwok III did not determine the number of tribal members;

Miwok II affirmed the Secretary's decision not to approve a proposed tribal constitution submitted by the Burley faction. See Miwok II, 515 F.3d at 1263. Only three Burley members approved the proposed constitution they submitted. Id. at 1266. The courts held that the three Burley members who approved the constitution did not constitute a majority of the Tribe, and therefore, their proposed constitution was an "antimajoritarian gambit [that] deserve[d] no stamp of approval from the Secretary."[6] Id. at 1267. Because the Burley faction did not represent "anything close to a majority of the [T]ribe," the courts in Miwok I and Miwok II denied the Burley faction's proposed constitution. Id.

The issue here is whether the Tribe consists of more than five members--the four Burley members plus Dixie. The Miwok I and Miwok II determination that the three Burley members were not a majority of the Tribe necessarily means that the Tribe must also consist of more than five members, which is the challenged issue here.

Plaintiffs, relying on Miwok III dicta, argue the issue here is different than in Miwok I and Miwok II because the issue there "was whether the Secretary had the authority to refuse to approve a constitution submitted under IRA § 476(h)(1)." See

---

it found that the Assistant Secretary was arbitrary and capricious for failing to address any evidence regarding tribal membership size. See Miwok III, 5 F. Supp. 3d at 98-99.

[6] The Miwok II court also took judicial notice of the fact that the Burley faction alleged in another action that the Tribe has a potential membership of 250. Miwok II, 515 F.3d at 1265 n.5; (see 2011 AR 299.)

Miwok III, 5 F. Supp. 3d at 101 n.15.  The court recognizes that Miwok III stated that Miwok I and Miwok II did not address whether the Tribe's membership consists of five members.  This is, however, an inaccurate and incomplete characterization of Miwok I and Miwok II.

Miwok I and Miwok II decided that the Secretary had the authority to deny the proposed constitution because the constitution did "not enjoy sufficient support from [the T]ribe's membership" and it was only approved by "Burley and her small group of supporters."  Miwok II, 515 F.3d at 1267. If the three Burley members did not constitute a majority of the Tribe, the Tribe must necessarily consist of more than five individuals.  Thus, Miwok I and Miwok II did decide the issue of whether the Tribe consists of more than five members when denying a proposed constitution approved by only three Burley members.

Second, the prior proceeding ended with a final judgment on the merits.  The prior proceeding resulted in a dismissal of the Burley faction's complaint for failure to state a claim upon which relief could be granted.  Miwok I, 424 F. Supp. 2d at 197.  The Burley faction had the opportunity to, and did, appeal the Miwok I decision, which resulted in the Miwok II decision.  There is no indication that the Burley faction "did not have a 'full and fair opportunity' to litigate" this issue in Miwok I or Miwok II.  See Allen, 449 U.S. at 95.

Third, the party against whom preclusion is asserted was a party at the first proceeding.  The Burley faction brought suit on behalf of the Tribe in Miwok I and Miwok II.  This is the group that defendants argue are precluded from litigating the

13

issue of tribal membership here.

Issue preclusion prevents plaintiffs from relitigating whether the Tribe consists of more than five members.[7] Accordingly, the December 2015 Decision was not arbitrary and capricious on this basis.

### B. Whether United States Recognizes Tribal Leadership

The December 2015 Decision found that the United States does not recognize any leadership for the Tribe, including the General Council established by the 1998 Resolution. (2015 AR 1401.) In reaching this conclusion, the Assistant Secretary noted that he "must ensure that [tribal] leadership consists of valid representatives of the Tribe as a whole," which requires "a process open to the whole tribal community." (Id.) Neither Burley nor Dixie established that a majority of eligible Tribe members ratified their form of tribal government, however.[8] (2015 AR 1401-02.) The December 2015 Decision's that the United States does not recognize a tribal government is reasonable in light of the facts contained in the administrative record.

The federal government has a "distinctive obligation of trust" in its dealings with Indians. See, e.g., United States v. Jicarilla Apache Nation, 564 U.S. 162, 192 (2011). As part of this obligation, the Assistant Secretary must ensure that the

---

[7] Federal defendants also argue that claim preclusion prevents challenging the entire decision. Claim preclusion does not apply because the claim litigated in this action is whether the December 2015 Decision was arbitrary and capricious. This was not a claim that the parties could have previously litigated because all other cases preceded the December 2015 Decision.

[8] The Burley faction is the only party that challenges this conclusion.

14

United States is conducting government-to-government relations with "valid representatives of the [tribe] as a whole." Seminole Nation of Okla. v. Norton, 223 F. Supp. 2d 122, 140 (D.D.C. 2002); see Aguayo v. Jewell, 827 F.3d 1213, 1224 (9th Cir. 2016) ("The [Assistant] Secretary properly exercises discretion not to approve a governing document when it does not 'reflect the involvement of the whole tribal community.'"); cf. Seminole Nation v. United States, 316 U.S. 286, 296-97 (1942) ("Payment of funds at the request of a tribal council which . . . was composed of representative faithless to their own people . . . would be a clear breach of the Government's fiduciary obligation.").

As previously discussed, other federal court decisions have held that the Tribe consists of more than five people. (See 2017 AR 1401.) Only two individuals, Dixie and Burley, approved the 1998 Resolution that established the General Council.[9] (2011 AR 179.) Plaintiffs cannot show that these two individuals were "a majority of those eligible to take part in a reorganization of the Tribe." (2017 AR 1401.) Because plaintiffs have not shown that the majority of adult members approved the General Council and the Assistant Secretary has an obligation to ensure that the United States interacts with valid tribal representatives, the Assistant Secretary was not arbitrary and capricious in declining to recognize a tribal government.

Plaintiffs argue that, consistent with BIA policy, a majority of Tribe members approved the 1998 Resolution because

---

[9] Reznor was an adult at the enactment of the 1998 Resolution, but did not sign it. (See 2011 AR 179.)

15

only Dixie and the Burley faction were eligible to form a tribal government. Under plaintiffs' argument, Dixie was the only original eligible Tribe member because he resided on the rancheria, until he adopted the Burley faction into the Tribe. This argument is flawed for several reasons.

First, "[a]n Indian tribe has the power to define membership as it chooses." Williams v. Gover, 490 F.3d 785, 789 (9th Cir. 2007). "[G]iven a tribe's sovereign authority to define its own membership, it is unclear how the BIA could have any [] policy" limiting original tribal membership to those residing on the land. See id. at 791.

Second, residence on the rancheria was a membership requirement only for rancherias restored under the Hardwick settlement. In those instances, the United States agreed to restore illegally terminated rancherias and defined original membership on the restored rancherias as those listed on the "distribution plans," who were the individuals who lived on the land at the time of termination. See Alan-Wilson v. Acting Sacramento Area Director, 33 IBIA 55, 57 (1998). That approach is inapplicable in this case because the Tribe was never terminated.

Third, the BIA has previously treated lineal descendants of individuals listed on census base rolls as the eligible members for organizational purposes. (See Apr. 24, 2012 Memorandum (Docket No. 50-2) (declining "to decide who are the current citizens of the [Tejon Indian] Tribe," but noting that the tribe's citizens are those who "were enumerated on and are descended from the 1915 Terrell BIA Census")); Alan-Wilson v.

16

Bureau of Indian Affairs, 30 IBIA 241, 249-50 (1997) ("Unorganized Federally recognized tribes would look to historical records and rolls to determine recognized membership for organizational purposes."); cf. Lewis v. Norton, 424 F.3d 959, 960-61 (9th Cir. 2005) (noting that a tribe's governing documents defined membership as all lineal descendants of persons named on base rolls with a certain percentage of "Indian blood"). The December 2015 Decision applies the same approach.

Plaintiffs also argue that Dixie's challenge to the 1998 Resolution in Miwok III was time-barred and therefore the December 2015 Decision resulting from the Miwok III remand is based on a time-barred claim. Under 28 U.S.C. § 2401(a), "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." When challenging an agency action, "[t]he right of action generally accrues at the time the agency action becomes final." Aguayo, 827 F.3d at 1226.

Even if Dixie's claim was time-barred, this does not deprive the Assistant Secretary of his obligation to ensure the United States interacts with a majoritarian government. "A cornerstone of this obligation is to promote a tribe's political integrity, which includes ensuring that the will of tribal members is not thwarted by rogue leaders . . . ." Miwok II, 515 F.3d at 1267; see also Seminole Nation, 223 F. Supp. 2d at 140 ("[T]he [BIA] has the authority and responsibility to ensure that the [tribe]'s representatives, with whom it must conduct government-to-government relations, are the valid representatives of the [tribe] as a whole."); cf. 25 U.S.C. § 2.

17

The Assistant Secretary was fulfilling his obligation to "ensure that [tribal] leadership consists of valid representatives of the Tribe as a whole" in the December 2015 Decision. (2015 AR 1401.) The Assistant Secretary's obligation to ensure that the United States is interacting with valid tribal representatives was the basis for the December 2015 Decision, not a time-barred claim.[10]

Plaintiffs also argue that because the purpose of the General Council is to serve as the governing body of the Tribe and the BIA once recognized the General Council, the BIA must now recognize the General Council as the valid tribal government. (See 2011 AR 177-78.) First, the stated purpose of General Council is not dispositive as to whether the United States must recognize it as the valid tribal government. See Seminole Nation, 223 F. Supp. 2d at 140. Second, the fact that the BIA once recognized the General Council does not preclude the BIA from later questioning its legitimacy. Cf. F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 514-15 (2009) (holding "agency action representing a policy change" is not subject to a heightened standard than agency action adopting a policy in the first place). Doing so "is not consistent with the 'distinctive obligation of trust' the federal government must employ when dealing with Indian Tribes." Miwok III, 5 F. Supp. 3d at 100.

In light of the record, the court finds that the Assistant Secretary was not arbitrary and capricious in finding

---

[10] Further, the statute of limitations applies to "civil action[s] commenced against the United States"; it does not bar an administrative official from considering an issue in an administrative proceeding. See 28 U.S.C. § 2401(a).

that the 1998 Resolution and General Council did not "sufficiently reflect[] the will of the [Tribe] in order to warrant the acknowledgement of the federal government." Cf. Aguayo, 827 F.3d at 1228 (holding the Assistant Secretary was not arbitrary and capricious in accepting a tribal constitution where it reflected the will of the tribe).

Plaintiffs have failed to show how the Assistant Secretary was arbitrary and capricious in issuing the December 2015 Decision.[11] Because plaintiffs cannot show that the Assistant Secretary was arbitrary and capricious, plaintiffs' claims must fail. Accordingly, the court must grant defendants' Motions for summary judgment and deny plaintiffs' Motion for summary judgment.

IT IS THEREFORE ORDERED that plaintiffs' Motion for summary judgment (Docket No. 44) be, and the same hereby is, DENIED; and

IT IS FURTHER ORDERED that defendants' Motions for summary judgment (Docket Nos. 46, 47) be, and the same hereby are, GRANTED.

Dated: May 31, 2017

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

---

[11] Plaintiffs devote substantial time arguing that Dixie and a non-party to this suit, Chadd Everone, committed fraud upon the court and falsely created the tribal leadership dispute. This issue is not relevant to whether the December 2015 Decision was arbitrary and capricious. The December 2015 Decision did not turn on whether Dixie or Burley was the leader of the Tribe, and it found that neither Dixie nor Burley was the recognized leader.

19